**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

FILED

| | |
|---|---|
| THE STATE OF CONNECTICUT OFFICE OF PROTECTION AND ADVOCACY FOR PERSONS WITH DISABILITIES, and JAMES MCGAUGHEY, Executive Director of The State of Connecticut Office Of Protection and Advocacy for Persons with Disabilities | )<br>)<br>)<br>)<br>)<br>) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| HARTFORD BOARD OF EDUCATION, HARTFORD PUBLIC SCHOOLS, and ROBERT HENRY, in his official capacity as the Superintendent of Schools | )<br>)<br>)<br>) |
| | ) |
| Defendants. | ) |
| | ) |

2004 AUG 11  P 3: 30

U.S. DISTRICT COURT
HARTFORD, CT.

CIVIL ACTION
NO.
**304CV1338**

August 11, 2004

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**I.      Introduction**

The State of Connecticut Office of Protection and Advocacy for Persons with Disabilities

(hereinafter "OPA") and its Executive Director, James McGaughey (hereinafter "McGaughey")

(collectively "Plaintiffs") have instituted this action to redress the refusal by Defendants Hartford

Board of Education (hereinafter "Board"), Hartford Public Schools (hereinafter "HPS") and

Robert Henry (hereinafter "Henry") (collectively "Defendants") to permit OPA to conduct an

investigation into allegations of abuse and neglect at the Hartford Transitional Learning

Academy (hereinafter "HTLA"), a school run by the Defendants.  Defendants have refused to

disclose certain directory information regarding the identity of parents or guardians of students

attending HTLA.[1] That directory information would enable the OPA to seek releases from those parents and guardians for the students' educational and other records. OPA additionally challenges Defendants' refusal to allow OPA access to the HTLA facilities at times when the students are in attendance.[2] This access authority is specifically granted to OPA pursuant to federal law.

These refusals by Defendants prevent OPA, the state and federally designated Protection and Advocacy System for persons with disabilities in Connecticut, from fulfilling its statutory mandates of investigating allegations of abuse and neglect as well as providing protection and advocacy services for individuals with disabilities. The actions of the Defendants further prevent OPA from determining whether the rights of students to be free from abuse and illegal restraint are being violated and whether there are appropriate procedures in place to prevent continued incidents of abuse and neglect.

Congress drafted the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. §15001, et. seq., because of the concern it had over instances of abuse of developmentally disabled persons such as those contained in the allegations in the instant matter. The DD Act established the Protection and Advocacy System ("P&A") to investigate and remedy abuse and neglect of persons with developmental disabilities, and to provide them with legal representation and advocacy services. The P&A system is a nationwide network of disability rights agencies that are mandated and designated for every state and territory of the United States. 42 U.S.C. § 15043(a)(2)(A)(i). To accomplish this goal, Congress granted broad investigative access authority to the P&As. In order to protect the rights of individuals with disabilities to be free from abuse and neglect, OPA, as the P&A for the State of Connecticut, has

---

[1] This directory information consists of name, address and telephone numbers of the parents or guardians of students who attend HTLA.

the authority to obtain the directory information that is being requested and to visit the HTLA facilities at times when the students are in attendance. 42 U.S.C. § 15043 (a)(2)(I)(i)-(iii), 42 U.S.C. § 15043(a)(2)(H), 45 C.F.R. § 1386.22(f) and (g).

Similarly, the Protection and Advocacy for Individuals with Mental Illness Act of 1986 42 U.S.C. §§ 10801-10827 (PAIMI) was enacted in 1986 by Congress to establish independent protection and advocacy systems (P&As) nationwide with authority to protect individuals with mental illness from abuse and neglect. 42 U.S.C. § 10801(b)(2)(A), (B). Congress established P&As in response to the myriad accounts of abuse and neglect against individuals with mental illness that were substantiated by congressional investigations. Congress found that "individuals with mental illness are vulnerable to abuse and serious injury" as well as "neglect, including lack of treatment, adequate nutrition, clothing, health care, and adequate discharge planning." 42 U.S.C. § 10801(a)(1), (3). Moreover, Congress found that "[s]tate systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate." 42 U.S.C. § (a)10801(4). Accordingly, Congress granted P&As the power to investigate incidents of abuse and neglect of persons with mental illness if the incidents are reported to P&As or P&As have probable cause to believe that incidents have occurred. 42 U.S.C. § 10805(1)(A).   Similar to the DD Act, PAIMI provides a P&A with the authority to seek records and have access to facilities at times service recipients (students) are present. 42 U.S.C. § 10806, 42 U.S.C. § 10805(a)(3), 42 C.F.R. § 51.42. Additionally, the Protection and Advocacy of Individual Rights (hereinafter "PAIR") 29 U.S.C. § 794e, et seq., provides access to records and facilities in the same manner as the DD Act and PAIMI for individuals with other disabilities not specifically provided for by PAIMI and the DD Act.

---

[2] HTLA maintains 2 facilities at two separate locations.

The authority of OPA to conduct investigations and to have access to records was recently upheld by the District of Connecticut in <u>Office of Protection and Advocacy for Persons with Disabilities v. Armstrong</u>, 266 F. Supp.2d 303 (D. Conn. 2003) (hereinafter <u>Armstrong</u>.).  In <u>Armstrong</u>, the Court discussed the history of the DD Act and PAIMI and ruled that "PAMII [sic] specifically charges the State's P&A, which is an independent agency, with the duty to 'investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred.'" <u>Id.</u> at 310.

If the Defendants do not release the directory information to OPA or provide OPA with access to HTLA when the students are present, OPA will suffer irreparable harm because it will not be able to fulfill its statutory obligation to investigate abuse and neglect, as well as to provide protection and advocacy services to students who have been, and may still be, at risk of abuse. There will be no harm to Defendants because the release of records to a P&A does not violate the confidentiality provisions of the Family Educational and Privacy Rights Act ("FERPA"), 20 U.S.C. § 1232g, or the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400 <u>et. seq.</u> The public interest will not be harmed, but rather furthered by OPA having access to the directory information and the facility to prevent continued harm to students at HTLA.  This Court should issue a preliminary and thereafter permanent injunction in this matter because Plaintiffs have the statutory authority to fully access the directory information.  Finally, OPA will be irreparably harmed if it is prevented from pursuing its right to access the directory information and to access the facility in pursuit of its statutory duty to investigate suspected incidents of abuse and neglect.

## II.    Statement of Facts

Hartford Transitional Learning Academy (hereinafter "HTLA") is a school that, despite its label of "transitional," functions as a placement of last resort in the Hartford Public School system.  HTLA primarily accepts children who have a label of "emotionally disturbed" and who have not experienced success at placements at other schools within the system, notably their local schools.  Upon information and belief, students who are placed at HTLA have disabilities that include mental illness, developmental disabilities, brain injuries and other disabilities including cognitive disabilities.[3]  Children also have a documented history of challenging negative behavior.  In order to be placed at HTLA a student and his/her parents or guardians need to sign an agreement that permits the use of "time-out procedures and/or restraints." Students and their parents or guardians must also sign a form permitting the use of "reasonable force when [an HTLA staff person] believes it is necessary to (a) protect himself/herself or others from immediate physical injury; (b) obtain possession of a dangerous instrument or controlled substance upon or within the control of such student or (c) **protect property from physical damage**." (Emphasis added.) Attached hereto as Attachment 1. Hartford Public Schools "Usage of Therapeutic Physical Restraint to Maintain Safety."

As part of its regular intake process, OPA has received complaints from parents of students at HTLA.  These complaints have included allegations that the students have been subjected to inappropriate restraint and seclusion.  Some of these allegations have included claims that the students were injured during the restraint process. Aff. of Centeno at ¶ 4-10. Attached hereto as Attachment 2. The students had a variety of disabilities including mental illness, developmental disabilities, and other cognitive impairments.

---

[3] Children with brain injuries are served under the DD Act. <u>Tennessee Protection & Advocacy, Inc. v. Wells</u>, 371 F.3d 342 (6th Cir. 2004).

investigators would "make every effort not to disrupt the educational environment." <u>See</u> Letter from OPA to Robert Henry, February 10, 2004. Attached hereto as Attachment 5.

On Tuesday, February 10, 2004 investigators from OPA and OCA arrived at HTLA. Faith VosWinkel from OCA and Bruce Garrison from OPA went into the school office at approximately 8:30 am, signed in and informed the clerk where they were from and that they wished to see Barbara Macauley, the principal of HTLA. The clerk asked them to wait. Aff. of Garrison at ¶ 8-10 and Aff. of VosWinkel at ¶ 8-10 attached hereto as Attachment 6.

When Macauley arrived at the office approximately 25 minutes later, she asked Mr. Garrison and Ms. VosWinkel to come into her office where Ms. VosWinkel told her that they were there to initiate an investigation into HTLA. Aff. of Garrison at ¶ 12 and Aff. of VosWinkel at ¶ 12. When Macauley expressed surprise and said she knew nothing about an investigation Ms. VosWinkel informed her that a letter had been sent to Defendant Henry. Aff. of Garrison at ¶ 13 and Aff. of VosWinkel at ¶ 13. Macauley informed Mr. Garrison and Ms. VosWinkel that she had not received a letter and asked what kind of investigation they intended to conduct. Ms. VosWinkel told her that during this particular visit they intended only to look at documents relating to policies, procedures and program descriptions of HTLA. She also stated that they planned additional visits to observe the programs at HTLA and to talk to faculty. She told Ms. McCauley that they would not be going into confidential student areas on that day. Aff. of Garrison at ¶ 14 and Aff. of VosWinkel at ¶ 14.

Macauley stated that before she could let Mr. Garrison and Ms. VosWinkel into the facility she needed to check with her administration. After leaving her office for approximately 10 minutes she returned and told them that she had spoken with Assistant Corporation Counsel

Ann Bird who advised her not to let them into the facility or to review any documents.  She then asked them to leave, which they did.  Aff. of Garrison at ¶ 16 and Aff. of VosWinkel at ¶ 16.

On or about April 7, 2004 staff from OPA and OCA met with Defendant Henry and Macauley and other officials from Defendant HPS and with counsel for the Defendants to try to resolve the question of access to the facility for the purpose of conducting the investigation. OPA explained the areas of concern it had and explained its authority for conducting the investigation.  OPA asked for directory information so that it could contact parents and guardians to seek consents for release of educational records and renewed its request for access to the facility.  At the conclusion of the meeting, OPA agreed that it would provide a letter to Defendants explaining its authority.  On April 12, 2004 OPA wrote to counsel for Defendants and discussed the various statutes which provided this authority, and cited to case law.  OPA renewed its request for both directory information and access to the facility.  See Letter from OPA to Ann Bird.  Attached hereto as Attachment 7.

On May 3, 2004 counsel for Defendants responded to OPA's letter and, citing the very privacy concerns refuted in OPA's letter, refused to allow OPA access to either the directory information or the facility.  See Letter dated May 3, 2004 from Ann Bird to OPA.  Attached hereto as Attachment 8.  On July 20, 2004 counsel for OPA wrote to counsel for Defendants attempting to resolve the matter and informing Defendants that should the matter not be resolved the case would have to be litigated.  Attached hereto as Attachment 9.  Counsel for Defendants responded on July 22, 2004.  In that letter Defendants continued to refuse to allow Plaintiffs access to the directory information.  Defendants did state that they would allow Plaintiffs access to the HTLA facility, but only when the students were not present.  Plaintiffs replied to this letter

on July 27, 2004 and informed Defendants that this offer was not acceptable.  Attached hereto as

Attachments 10 and 11.

**III.     Argument**

### OPA HAS MET THE REQUIREMENTS FOR INJUNCTIVE RELIEF AND IS ENTITLED TO A PRELIMINARY INJUNCTION

Injunctive relief is available when there is no adequate remedy at law and the balance of

equities favors the moving party.  See 11 Charles Alan Wright & Arthur R. Miller, Federal

Practice and Procedure § 2944 at 394 (1973 and 1992 Supp.); accord N.Y. State National

Organization for Women v. Terry, 704 F. Supp. 1247, 1262 (S.D.N.Y. 1989), aff'd on other

grounds 886 F.2d 1339 (2d Cir. 1989). A plaintiff seeking preliminary injunctive relief in this

Circuit must demonstrate: "(1) irreparable harm and (2) either (a) likelihood of success on the

merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping

decidedly toward the party seeking the injunctive relief." Malkentzos v. DeBuono, 102 F.3d 50,

54 (2d Cir. 1996), Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir. 1992), citing Resolution Trust

Corp. v. Elman, 949 F.2d 624, 626 (2d Cir. 1991).  See also OPA v. Armstrong, 266 F. Supp.2d

at 311.

Ordinarily, the purpose of the injunction is to maintain the status quo pending a trial on

the merits. Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985). However, occasionally

injunctive relief may change the status quo of the parties. Id.  This type of injunction is

mandatory, rather than prohibitory.  As a result, this Circuit has required the movant to meet a

higher standard, a substantial or clear showing of likelihood of success on the merits.

Furthermore, a mandatory injunction may also be issued upon a showing that "extreme or very

serious damage will result" from a denial of injunctive relief. Id.  This heightened standard is

also required, whether the injunction is mandatory or prohibitory, where injunctive relief will

provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at trial on the merits. Tom Doherty Assocs., Inc. v. Saban Int'l, 60 F.3d 27, 34 (2d Cir. 1995), Forest City Daly Housing, Inc. v. Town of North Hempstead, 175 F.3d 144, 149 (2d Cir. 1999).

Such is this case. OPA must show a substantial or clear likelihood of success on the merits. If OPA is granted injunctive relief, Defendants will be required to release directory information to allow OPA to seek consents for release of information from parents and guardians of students at HTLA, Defendants will be required to provide OPA access to the HTLA facilities when the students are present, and Defendants will be required to permit OPA to conduct its investigation. This relief will provide OPA with substantially all the relief sought and that relief cannot be undone even if Defendants prevail at trial on the merits.

In the present case, no adequate remedy at law exists for OPA. OPA requested access to the directory information and the facility and was denied such access. It is clear that Plaintiffs cannot be made whole through money damages and will continue to suffer irreparable harm without injunctive relief. In view of the federal protection and advocacy mandates, OPA has a substantial likelihood of success on the merits of its claim. Indeed, in Armstrong the Court held that

> [i]n this case, there can be no dispute that Connecticut P&A has no other adequate remedy at law, and that it will be irreparably harmed if it is 'prevented from pursuing fully its right to access records...in pursuit of its duty to investigate circumstances providing probable cause to believe abuse or neglect may be occurring.'

Armstrong, 266 F. Supp. 2d at 311.

Armstrong is not an anomaly. Most courts that have considered whether to grant an injunction in the DD Act and PAIMI context have held that the injunction should be granted. See Alabama Disabilities Advocacy Program v. Tarwater Developmental Ctr., aff'd, 97 F.3d

492 (11th Cir. 1996), 894 F. Supp. 424 (M.D. Ala. 1995)(permanent injunction); <u>Mississippi Prot.</u> <u>& Advocacy Sys. Inc. v. Cotton</u>, 929 F.2d 1054 (5th Cir. 1991)(mandatory injunction); <u>Iowa Prot.</u> <u>& Advocacy Serv., Inc. v. Gerard Treatment Programs L.L.C.</u>, 152 F. Supp.2d 1150 (N.D. Iowa June 25, 2001), <u>modified</u> July 27, 2001 (preliminary injunction); <u>Wisconsin Coalition For</u> <u>Advocacy v. Czaplewski</u>, 131 F. Supp.2d 1039 (E.D. Wisc. 2001)(preliminary injunction); <u>Washington Prot. & Advocacy Syst., Inc. v. State of Washington</u>, No. C98-5401 RJB (W.D, Wash. July 26, 1999); <u>Advocacy Ctr. v. Stalder</u>, 128 F. Supp. 358 (M.D. La. 1999)(permanent injunction); <u>Oklahoma Disability Law Ctr., Inc. v. Dillon Family & Youth Servs., Inc.</u>, 879 F. Supp. 1110 (N.D. Okla. 1995)(permanent injunction); <u>Robbins v. Budke</u>, 739 F. Supp. 1479 (D.N.M. 1990)(permanent injunction).  This Court should likewise grant Plaintiffs injunctive relief, preliminary and permanent thereafter.

**1.  Irreparable Harm**

"Irreparable injury is the <u>sine qua non</u> for the grant of a preliminary injunctive relief." <u>United States Postal Serv. v. Brennan</u>, 579 F.2d 188, 191 (2d Cir. 1978) (citations omitted). A showing of irreparable harm is considered perhaps the single most important requirement in satisfying the standard. <u>Pinckney v. Bd. of Educ. of the Westbury Union Free School Dist.</u>, 920 F. Supp. 393, 399 (E.D.N.Y. 1996).  Ordinarily, "irreparable harm means injury for which a monetary award cannot be adequate compensation." <u>Loveridge v. Pendelton Woolen Mills, Inc.</u>, 788 F.2d 914, 917 (2d Cir. 1986), <u>quoting Jackson Dairy, Inc., v. H.P. Hood & Sons, Inc.</u>, 596 F.2d 70, 72 (2d Cir. 1979). However, a showing of irreparable injury may be presumed in certain instances of civil rights violations. Therefore, "a traditional showing of irreparable harm is not required when a plaintiff seeks equitable relief to prevent the violation of a federal statute...."

McKinney v. Town Plan and Zoning Comm'n, 790 F. Supp.1197, 1207, (D. Conn. 1992).  See also Connecticut Hosp. v. City of New London, 129 F. Supp.2d. 123, 128 (D. Conn. 2001).

To illustrate, one such context where irreparable harm may be presumed is where there is a showing of a violation of the Fair Housing Act. McKinney, 790 F. Supp. at 1207, Connecticut Hosp.,129 F. Supp.2d. at 128. Although the Second Circuit has yet to rule conclusively on this issue, other circuits have. Gresham v. Windrush Partners, Ltd., 730 F.2d 1417, 1423 (11th Cir. 1984)(National Housing Act); Baxter v. City of Belleville, Ill., 720 F. Supp. 720, 734 (S.D. Ill. 1989)(Fair Housing Act); Bronson v. Crestwood Lake Section I Holding Corp., 724 F. Supp. 148, 153 (S.D.N.Y. 1989)(Fair Housing Act).

Irreparable harm may similarly be presumed in the present case as in McKinney and Connecticut Hospital. OPA seeks injunctive relief to prevent violations of the DD Act, PAIMI, and PAIR, all federal civil rights statutes. OPA, like the plaintiffs in McKinney and Connecticut Hospital, presents facts sufficient to establish that its authority under these statutes has been violated. Both the courts in McKinney and Connecticut Hospital found that irreparable injury could be presumed because the plaintiffs' rights had been violated under the Fair Housing Act. McKinney, 790 F. Supp. at 1207, Connecticut Hosp.129 F. Supp.2d at 128. The conclusions reached in those cases should apply with equal force to the application of the federal P&A statutes. OPA has the statutory authority to the access it seeks. Since Defendants have not provided such access, OPA's rights have been violated under its federal statutes. Thus, this Court should find that OPA is per se irreparably injured. Armstrong, 266 F. Supp.2d at 311.

As the Court concluded in Armstrong, OPA continues to suffer irreparable harm. Id. The harm that OPA will suffer should this Court deny injunctive relief is quite serious. OPA will lose its ability to fulfill its statutory duty to investigate suspected incidents of abuse and neglect

12

in pursuit of its federal mandate to protect and advocate for persons with disabilities.  As stated at page 2 supra, Congress drafted the DD Act because of the concern it had over instances of abuse of developmentally disabled persons such as those contained in the allegations in the instant matter.  To respond to this concern, Congress granted broad investigative access rights to the P&As.

Similarly, in 1985, Congress concluded that the rights of individuals with mental illness were not being protected and PAIMI, 42 U.S.C. §§ 10801-10827, was enacted. Under PAIMI, state systems have the authority to independently investigate either upon a report or when it has probable cause to believe such an act of abuse or neglect has occurred.  42 U.S.C. § 10801 and 42 C.F.R. § 51.41.  Thus, under PAIMI, the DD ACT and PAIR P&A's also have authority to pursue administrative, legal, and other appropriate remedies to insure protection of individuals with mental illness. 42 U.S.C. § 10805(a)(1), and 42 C.F.R. § 51.31, 42 U.S.C. § 15043(a)(2)(A)(i).[4]  Therefore, if OPA is not permitted to conduct its investigation and have access to the HTLA facilities at times students are present and to the directory information, OPA will be irreparably harmed in its ability to fulfill its statutory mandates.

Prior to Armstrong, the Eastern District of Wisconsin recognized the serious harm to a P&A's statutory duty to investigate suspected incidents of abuse and neglect if it were deprived of its statutory right to access requested records in pursuit of its mandate to investigate.  In Wisconsin Coalition For Advocacy v. Czaplewski, the plaintiff successfully argued that the defendant's refusal to provide records which the plaintiff was entitled frustrated its ability to carry out its mandate to investigate abuse and neglect. Czaplewski, 131 F. Supp.2d 1039, 1050 (E.D. Wisc. 2001). The court in Czapleswki cited to a variety of specific harms to its ability to

---

[4] PAIR is based upon the DD Act, this argument is also relevant with respect to PAIR.  29 U.S.C. § 794e(f)(2).

conduct a timely investigation. Most relevant to the instant case the court held that "[p]erhaps most importantly, the residents on whose behalf it must act bear the risk of injury or death." Id. at 1051. The court was persuaded that the defendant's refusal to provide the plaintiff with records that it was entitled to review as part of its responsibilities "in a very real and readily identifiable way, pose[s] a threat to the plaintiff's being able to discharge its obligations. And no amount of damages will remedy that sustained harm." Id. In the instant case, OPA is, at this time, asking only for directory information and facility access, thus making the argument in favor of disclosure even more compelling.

Defendants have prevented OPA from performing its federal mandates and from taking steps to protect these young people from abuse and neglect. OPA has the authority and the obligation to investigate the allegations regarding HTLA. Interference with OPA's efforts to carry out its federal mandate harms OPA and the individuals it is empowered to protect. If a P&A is denied records for a claim it is investigating, it suffers direct injury to its statutory interest. Armstrong, 266 F. Supp.2d at 311, Stalder, 128 F. Supp. 2d at 362.

## 2. Substantial Likelihood of Success on the Merits

The second step of the inquiry for injunctive relief requires that the plaintiff demonstrate a substantial or clear showing of likelihood of success on the merits, where: (a) an injunction will alter, rather than maintain, the status quo, or (b) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at the trial on the merits. See Saban Int'l, 60 F.3d at 34 and Abdul Wali, 754 F.2d at 1025. Here, OPA has met the requirement of showing a substantial likelihood that it will prevail on the merits.

OPA is a federally funded protection and advocacy system mandated to provide protection and advocacy services for persons with disabilities. See supra at 2-3. In pursuit of OPA's federal authority to investigate suspected incidents of abuse and neglect, PAIMI and the DD Act mandate that OPA be given access to records when incidents of abuse or neglect are reported, or when the P&A makes a probable cause determination that abuse or neglect may have occurred. 42 U.S.C. § 10805(a)(4)(A), (B), 42 U.S.C. § 15043(a)((1)(I), 29 U.S.C. § 794e(f)(2). In this case the only records OPA is seeking is the directory information so OPA may contact parents and guardians to seek consent for the release of records. Defendants have violated the DD Act, PAIMI and PAIR by refusing to provide OPA with this information.

In addition, both PAIMI and the DD Act provide that P&A's shall have access to facilities in order to conduct investigations. 42 U.S.C. § 10805(a)(C)(3), 42 U.S.C. § 15043(a)(2)(H), 42 C.F.R. § 51.42, 45 C.F.R. § 1386.22(f) and 29 U.S.C. § 794e(f)(2). This access to facilities expressly includes the right to have access to service recipients "at all times necessary to conduct a full investigation of an incident of abuse or neglect. This authority shall include the opportunity to interview…the person thought to be the victim of such abuse." 42 C.F.R. § 51.42(b). See also 45 C.F.R. § 1386.22(f) and (g).[5] This position has been supported by case law. See Mississippi Protection and Advocacy Syst. v. Cotten, 1989 WL 224953 (S.D. Miss. Aug. 7 1989) *8, Robbins v. Budke, 739 F. Supp. 1479, 1489 (D.N.M. 1990). Neither must the P&A seek permission of a parent or guardian before speaking to service recipient. Iowa Protection and Advocacy Serv., Inc. v. Res-Care Premier, Inc. No. 4-02-CV-10012 (S.D. Iowa July 8, 2002) (unpublished), slip opinion at 7-8, attached hereto as Attachment 12, Iowa

---

[5] While both the DD Act and PAIMI speak in terms of "residents," neither statute requires that an individual must actually reside in a facility to receive services from a P&A. See text infra at 16-17.

Protection and Advocacy Syst., Inc. v. Gerard Treatment Programs L.L.C., 152 F. Supp.2d 1150, 1171 (N.D. Iowa 2001).

In 1975, prior to enacting PAIMI, Congress adopted the Developmental Disabilities and Bill of Rights Act (DD Act) to protect the human and civil rights of individuals with developmental disabilities. 42 U.S.C. §§ . 15001 et seq. Congress later enacted PAIMI in 1986 in response to congressional hearings and investigations evidencing abuse and neglect in state psychiatric facilities. 42 U.S.C. §§ 10801-10827. Protection and advocacy systems were established to ensure that these vulnerable populations were protected. Armstrong, 266 F. Supp.2d at 309.

OPA is designated as an "eligible system." 42 U.S.C. §10802(2), 42 U.S.C. § 15043(a), 29 U.S.C. § 794e(m), Conn. Gen. Stat. § 461-10. It is mandated to investigate and pursue legal remedies for abuse and neglect of persons with disabilities, and to provide them with legal representation and advocacy services. See, e.g. 42 U.S.C. § 10805(a)(1)(A) and (B), 42 U.S.C. 15043(a)(2)(A)(i) and (B), § 29 U.S.C. § 794e(f)(3). Federal statutes and regulations require that protection and advocacy systems have access to facilities and to records of individuals with mental illness, developmental disabilities and other disabilities. See 42 U.S.C. § 10805(a)(C)(3), 42 U.S.C. § 10806, 42 U.S.C. § 15043(a)((1)(I), 42 U.S.C. § 15043(a)((1)(H), 42 C.F.R. § 51.41-42, 45 C.F.R. § 1386.22(f) 29 U.S.C. § 794e(f)(2).

Courts have consistently held that the DD and PAIMI Acts require states to permit the P&A agency to operate effectively, and with broad discretion and independence in gaining access to facilities and records.[6] See supra text at 9-10 and accompanying citations. The court in Cotton expounded upon this obligation as follows:

---

[6] It was Congress' intent that the DD and PAIMI Acts be applied in a like manner. See S.Rep.No. 109, 99th Cong., 1st Sess. 3 (1986); S.Rep. 113, 100th Cong., 1st Sess. 24 (1987), 1987 U.S.C.C.A.N. 781, 803-04; Alabama

The Act not only describes the range of services to be provided by the protection and advocacy systems, it also states that the systems **must have the authority** to perform these services.  The state cannot satisfy the requirements of the [DD Act] by establishing a protection and advocacy system which has this authority in theory, but then taking action which prevents the system from exercising that authority.

Mississippi Prot. & Advocacy Sys. Inc. v. Cotton, 929 F.2d 1054, 1058 (5th Cir. 1991)(emphasis in original).  As the court noted in Alabama Disabilities Advocacy Program v. Tarwater Developmental Ctr., any other reading "would attribute to Congress an intent to pass an ineffective law." Tarwater, 894 F. Supp. at 429.

It is also clear that as a public school serving children with disabilities, HTLA is a "facility" within the definition of the P&A statutes.  The P&A Acts do not limit P&A access authority to any particular setting, such as residential facilities.  For example, under the DD Act, P&As have "access at reasonable times to any individual with a developmental disability in a location in which services, supports, or other assistance are provided to such an individual, in order to carry out the purposes of this [Act]." 42 U.S.C. § 15043(a)(2)(H).  PAIMI has a similar provision. 42 U.S.C. § 10805(a)(C)(3).  Public non-residential schools fall within this definition because they are "locations" providing "services, supports or other assistance" to children with disabilities.[7]  Moreover, P&As have the authority and duty to ensure the protection of the rights of any individual with a developmental disability within a state, regardless of his or her living arrangement or location where the services are provided.  42 U.S.C. § 15043(a)(2)(A)(i).  Similarly, following amendments in 2000, the PAIMI Act extends coverage to persons residing in the community, repealing the former requirement that the individual must reside in a "facility"

---

Disabilities Advocacy Program v. Tarwater Developmental Ctr., 894 F. Supp. 424, 428 (M.D. Ala. 1995), affirmed, 97 F.3d 492 (11th Cir. 1996).

[7] In addition to providing traditional classroom educational services to special education students school districts are required under IDEA to provide appropriate "related services" which include, but are not limited to, psychological services, physical and occupational therapy, counseling services, health and social work services, and parent counseling and training.  34 C.F.R. § 300.24(a).

to receive P&A services. 42 U.S.C. § 10802(4)(B)(ii). Finally, as noted above, Congress

expressly stated that P&As should be actively involved in monitoring and investigating the

provision of education to students with disabilities. *See* 42 U.S.C. §§ 15001(a)(1) and 15002(2)

and (10).

OPA, as the P&A, has the authority to have access to the names and contact information

of all the students' parents and guardians at HTLA and to have access to the facilities at times the

students are present. 42 U.S.C. § 10806, 42 U.S.C. § 15043(a)(1)(I), 42 C.F.R. §51.41 and 42, 45

C.F.R. 1386.22. Courts have found that P& A requests for information such as names, address

and phone numbers of individuals for whom the P&A has probable cause to believe have been or

may be abused or neglected, are well within the access authority of P & As, as such information

is necessary in order for the P & A to effectively and fully carry out its mandate such

investigations. See, e.g., Georgia Advocacy Office v. Borison, et al., 520 S.E.2d. 701 (1999)

(where Georgia P & A had probable cause to believe that drug trial participants had been abused

and neglected, the appellate court remanded to superior court with instructions to release all

relevant records, including the names, addresses and other contact information for all relevant

study participants to P & A).

Similarly, in Pennsylvania Protection & Advocacy, Inc. (PP&A) v. Royer- Greaves

School for the Blind, 1999 WL 179797 (E.D. Pa. March 25, 1999), the Court held that the

Pennsylvania Protection and Advocacy Inc. was entitled to a list of guardians provided by the

school, even though the Protection and Advocacy Agency was unable to provide a sufficient

basis of complaints or probable cause to warrant access, and the residents were not clients of the

P&A. The Court ruled that even if there was reasonable grounds for denial of records, the

facility still had to provide the P & A with the names and contact information for all of the

students' guardians. Id. at *10.  The Court acknowledged that this was a broad power for the

P&A, but also that requiring the facilities to turn over the guardians' contact information made

sense.  Id.  In order to obtain authorization, "the P & A must be able to contact the guardian.  But

if it does not have the guardians name and contact information, it cannot do so, leaving the P &

A with no ability to obtain consent.[8]  Requiring that the facility release the contact information

remedies this dilemma." Id.

Thus, in the instant case, HTLA is obligated to release the parent and guardian's contact

information to OPA.  While under the DD Act and PAIR, OPA has the authority to access this

contact information without a sufficient basis of complaints or probable cause, in this case, OPA

has received a complaint to the system, and has determined that there is probable cause.  OPA

has also determined there is probable cause to suspect abuse and neglect given the failure of

HTLA to implement individualized behavioral intervention plans that would lessen the need to

utilize restraint and seclusion.  See Aff. of Garrison at ¶ 18-20 and Aff. of Centeno at ¶ 4-10.

OPA thus meets the elements necessary to obtain the requested guardian contact information on

several different legal bases.

Defendants claim they cannot release the directory information to OPA because of IDEA

and FERPA.  Letter of Bird to OPA at 2.  Attachment 8.  However, case law holds that the P&A

access authority prevails over FERPA's restrictions.  The Court in Michigan Protection and

Advocacy Service v. Miller, 849 F. Supp. 1202 (W.D. Mich. 1994), held that the defendant

---

[8] The DD Act allows access to records without consent of a private non-state agency guardian as long as an effort was made to obtain consent, assistance was offered to resolve the situation and the guardian has failed or refused to act on behalf of the individual when the P&A has received a complaint or has probable cause to suspect abuse or neglect.  42 U.S.C. §15043(a)(2)(I)(iii)(I)-(V).  If OPA is able to obtain the guardian contact information, as noted above, it can still access the records even if a guardian refuses to authorize release of such records.  45 C.F.R. 1386.22(a)(3)(i)-(iii).  As held in Disability Law Center v. Reil, 130 F. Supp. 2d 294 (D. Mass. 2001), OPA as the designated Protection and Advocacy agency for the State of Connecticut, has access rights to records mandated notwithstanding the "good faith" refusal of guardians to authorize the release of such records.  At the current time, OPA is not seeking such access.

could not rely on FERPA or the IDEA to deny a P&A access to records it needed to conduct an investigation. The Court noted that, "[FERPA] does prohibit federal finding to educational institutions which permit the release of records without parental consent. The DD, PAIMI and PAIR Acts, however, clearly mandate that organizations like [Michigan Protection and Advocacy System] have the authority to access DSS facilities and records in specific cases where the developmentally disabled and mentally ill individuals are involved. Defendant's reliance on the IDEA is misplaced." Id. at 1208.

Similarly, in the instant matter, as in Miller, OPA, as the Protection and Advocacy agency for the State of Connecticut, is seeking access to the facilities so that OPA can pursue its investigation of allegations of abuse and neglect at HTLA. As the P&A, OPA has a duty of confidentiality under §42 U.S.C. § 10806(a) and (b), 45 C.F.R. 1386.22(e)(1)-(3), for any information obtained by a P&A about clients or potential clients, barring any disclosure of such information to third-parties. Armstrong, 266 F. Supp.2d at 310-311. See also Czaplewski, 131 F. Supp.2d at 1052 (Court ruled that the residents of a nursing home would suffer no privacy harm because of confidentiality restrictions on P & As.)[9] This facility access is part of the foundation of the P&A's authority, and has consistently been upheld. See Mississippi Prot. & Advocacy Sys. Inc. v. Cotton, 929 F.2d 1054 (5th Cir. 1991).

Thus, OPA is likely to win on the merits of this case because as part of its investigation, OPA has the authority to the contact information of parents and guardians and the authority to access the facility. Additionally, as OPA is bound by the confidentiality provisions of the DD

---

[9] Notably, there appears to be one case holding otherwise; however, both the lower court's decision and the one page order from the appellate court, affirming the trial court decision, were unpublished with no precedential effect under the court's rules. Washington Protection and Advocacy Svc v. Evergreen Sch. Dist, 71 Fed.Appx. 654, 2003 WL 21751827 (9th Cir. 2003) (P&A access authority did not trump FERPA's restrictions on releasing information). In addition, the Court's analysis was deficient because it did not address the fact that the regulations implementing the DD Act, 45 CFR

Act and PAIMI barring any third-party disclosure of such information there is no risk of any harm to the students' privacy.  <u>Armstrong</u>, 266 F. Supp. 2d. at 320.  <u>See also</u> <u>Arizona Ctr. for Disability Law v. Allen</u>, 197 F.R.D. 689, 692 (D. Ariz. 2000).  Consequently, Defendants' reliance on state and federal statutes and regulations dealing with disclosure of student information is misplaced.

## IV.   Conclusion

For the foregoing reasons, Plaintiffs request that this Court issue a preliminary injunction and thereafter a permanent injunction enjoining Defendants from continuing to refuse Plaintiffs access to the HTLA facilities at times students are present and to the directory information of the parents and guardians of the students in pursuit of its statutory obligation to investigate suspected incidents of abuse and neglect.  Furthermore, the Court should enjoin the Defendants from engaging in similar acts in the future and order the Defendants to immediately give Plaintiffs the access requested.

Respectfully submitted,

The Plaintiffs,
The State of Connecticut
Office of Protection and Advocacy
For Persons with Disabilities
James McGaughey

By: _____
NANCY B. ALISBERG
Office of Protection and Advocacy
For Persons with Disabilities
60B Weston Street
Hartford, CT 06120
Fed. Bar. No. CT 21321
(860) 297-4397
Fax:  (860) 566-8714

---

1386.22(i) themselves require that service providers turn over identities of guardians to P&As without any showing of probable cause.

PAULETTE G. ANNON
Office of Protection and Advocacy
For Persons with Disabilities
60B Weston Street
Hartford, CT 06120
Fed. Bar No.  CT21556
Fax:  (860) 566-8714
(860) 297-4329
paulette.annon@po.state.ct.us