UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE STATE OF CONNECTICUT | : | |
| OFFICE OF PROTECTION AND | : | |
| ADVOCACY FOR PERSONS WITH | : | |
| DISABILITIES and JAMES | : | |
| MCGAUGHEY, Executive Director of | : | |
| The State of Connecticut Office Of | : | |
| Protection and Advocacy for Persons | : | |
| with Disabilities, | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3-04-cv-1338 (JCH) |
| HARTFORD BOARD OF EDUCATION, | : | |
| HARTFORD PUBLIC SCHOOLS, | : | |
| and ROBERT HENRY, in his official | : | |
| capacity as the Superintendent of | : | |
| Schools, | : | |
| Defendants | : | |
| | : | |
| | : | FEBRUARY 7, 2005 |

**RULING ON PLAINTIFFS' MOTION FOR A PERMANENT INJUNCTION [DKT. NO. 3]**

Seeking declaratory and injunctive relief, the plaintiffs, the State of Connecticut

Office of Protection and Advocacy for Persons with Disabilities ("OPA") and its

Executive Director, James McCaughey, initiated this action against the defendants,

Hartford Board of Education, Hartford Public Schools, and Robert Henry, on August 11,

2004.  On that same date, they filed a Motion for a Preliminary Injunction requesting

access to the Hartford Transitional Learning Academy ("HTLA") and directory

information for students and their parents or guardians for the purposes of conducting

an investigation into allegations of abuse and neglect at HTLA. [Dkt. No. 3].  The

plaintiffs claim that, pursuant to certain federal statutes, they are entitled to access

facilities treating persons with certain disabilities and mental illnesses for the purposes

1

of investigating allegations of mistreatment or abuse.  28 U.S.C. §794e; 42 U.S.C.

§15001 et seq.; 42 U.S.C. §§ 10801-10827.  On August 31, 2004, the parties agreed to

merge the request for a preliminary injunction with the plaintiffs' request for a

permanent injunction.  See FED. R. CIV. P. 65(a)(2).  The parties also agreed to stipulate

to certain facts for the purposes of the Motion for a Permanent Injunction.  Stipulations

of Fact [Dkt. No. 13].  The court heard oral argument on January 21, 2005.  On that

date, the defendants withdrew its then-pending Motion to Strike [Dkt. No. 16].

## I.    FACTS

The parties have stipulated certain facts.  The Hartford Transitional Learning

Academy is operated by the Hartford Board of Education for the purpose of providing a

therapeutic educational program for students who require special education and related

services and who are considered "seriously emotionally disturbed."  Stipulations of Fact

[Dkt. No. 13] at ¶¶ 6-7.  The plaintiffs allege that they have received complaints that

students at HTLA have been subjected to inappropriate restraint and seclusion and that

in certain instances, students have suffered injury as a result.  Id. at ¶ 12.  The

defendants concede that Hartford Public Schools policy allows teachers and

administrators at HTLA to "use reasonable physical force when he/she believes it is

necessary to (a) protect himself/herself or others from immediate physical injury; (b)

obtain possession of a dangerous instrument or controlled substance upon or within the

control of such student; or (c) protect property from physical damages."  Usage of

Therapeutic Physical Restraint to Maintain Safety [Dkt. No. 13, Ex. B].  As a result of

complaints and other evidence, OPA has determined that probable cause exists to

suspect that HTLA students are subjected to abuse and neglect.  Stipulations of Fact

[Dkt. No. 13] at ¶ 14.

Upon making this determination, OPA and the Office of the Child Advocate initiated an investigation of HTLA.  Id. at ¶ 15.  On February 3, 2004, McGaughey and Joanne Milstein of the Office of the Child Advocate wrote to Defendant Henry to notify him that they would be investigating complaints received "regarding the provision of educational and related services to Hartford students" at HTLA.  Letter, February 3, 2004 [Dkt. No. 13, Ex. D].  On February 10, representatives of OPA and the Office of the Child Advocate went to HTLA.  Stipulations of Fact [Dkt. No. 13] at ¶ 17.  They were denied access to students and to records.  Id.  Representatives of OPA and the Hartford Board of Education and Hartford Public Schools attempted to negotiate a resolution.  Disputes regarding the applicability of OPA's authorizing statutes to HTLA, as well as HTLA's ability to provide the information requested by OPA in the face of federal law protecting students' privacy and confidentiality, prevented such resolution. See Stipulations of Fact [Dkt. No. 13], ¶¶ 18-22.

## II.   ANALYSIS

### A.   The Standards for a Permanent Injunction and Declaratory Relief

The plaintiffs seek declaratory relief pursuant to section 2201 of Title 28 of the United States Code.  That section provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. §2201.   "[A] court must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal

relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." <u>Continental Cas. Co. v. Coastal Sav. Bank</u>, 977 F.2d 734 (2d Cir. 1992) (citing <u>Broadview Chem. Corp. v. Loctite Corp.</u>, 417 F.2d 998, 1001 (2d Cir.1969)).

The plaintiffs also seek a permanent injunction.  "Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." <u>New York State Nat. Organization for Women v. Terry</u>, 886 F.2d 1339, 1362 (2d Cir. 1989).  In addition, the plaintiff must demonstrate actual success on the merits rather than a likelihood of success, as is required when a preliminary injunction is requested.  <u>Amoco Production Co. v. Village of Gambell</u>, 480 U.S. 531, 546 n. 12 (1987).

Courts have concluded that a protection and advocacy system's inability to meet its federal statutory mandate to protect and advocate the rights of disabled people, <u>see</u> discussion, <u>infra</u>, section II.B., constitutes irreparable harm.  <u>See Office of Protection and Advocacy for Persons with Disabilities v, Armstrong</u>, 266 F.Supp.2d 303, 310 (D.Conn. 2003) (citing cases).  Should OPA demonstrate success on the merits, it is clear that there is no adequate remedy at law.  <u>Id.</u>  The only adequate relief would be to require the defendants to allow OPA access to HTLA and relevant records pursuant to the relevant statutes.

**B.    OPA's Authority Under Federal Statute**

The OPA is established pursuant to Connecticut statute "for the protection and advocacy of the rights of persons with disabilities and developmentally disabled persons."  Conn. Gen. Stat. §46a-10.  It serves as the protection and advocacy system

4

for the purposes of three federal statutes described below, the Developmental Disabilities Assistance and Bill of Rights Act, the Protection and Advocacy of Individual Rights Act, and the Protection and Advocacy for Mentally Ill Individuals Act. The OPA is bound by state and federal law regarding confidentiality. Conn. Gen. Stat. §46a-11h; 42 U.S.C. §10806.

### 1.    The Development Disabilities Assistance and Bill of Rights Act

The Developmental Disabilities Assistance and Bill of Rights Act ("DD Act") provides for federal funding of state systems "to protect the legal and human rights of individuals with developmental disabilities. . . . ." 42 U.S.C. §15041; 42 U.S.C. §15042. In order to qualify for such funds, a state must have in place a system that is authorized to provide effective advocacy for and protection of the rights of developmentally disabled persons. 42 U.S.C. §15043(a)(2)(A). Further, such systems must "have access at reasonable times to any individual with a developmental disability in a location in which services, supports, and other assistance are provided to such an individual" as well as access to records of developmentally disabled individuals when certain factors arise. 42 U.S.C. §15043(a)(2)(H) - (I). Where a system is entitled to access to records, such records must be provided to the system "not later than 3 business days after the system makes a written request for the records involved." 42 U.S.C. §15043(J)(I). To the extent that developmentally disabled students attend HTLA, see discussion, infra, section II.C., the school is undoubtedly a "location in which services, supports, and other assistance are provided." 42 U.S.C. §15043(a)(2)(H) - (I).

### 2.      The Protection and Advocacy of Individual Rights Act

The Protection and Advocacy of Individual Rights Act ("PAIR") creates an

identical framework with respect to the rights of individuals with disabilities.  29 U.S.C.

§794e.  PAIR applies to individuals with disabilities who are not entitled to protection or

services under either the Protection and Advocacy for Mentally Ill Individuals Act or the

DD Act.  29 U.S.C. §794e(a)(1)(B).  In order to receive federal funds under PAIR, a

state must "have in effect a system to protect and advocate the rights of individuals with

disabilities" and such system must "have the same general authorities, including access

to records and program income, as are set forth" in the DD Act.  42 U.S.C. §794e(f)(1)-

(2).  Thus, while PAIR applies to a broader segment of the population of individuals with

disabilities, it allows protection and advocacy systems the same breadth of investigative

and advocacy authority allowed under the DD Act.  Again, to the extent that students

protected by PAIR attend HTLA, see discussion, infra, section II.C, the school must

provide OPA with access to such students.

### 3.      The Protection and Advocacy for Mentally Ill Individuals Act

The Protection and Advocacy for Mentally Ill Individuals Act ("PAMII")[1] provides

an similar system for the purposes of protecting the rights of mentally ill individuals.  42

U.S.C. §10801-10807.  The Act provides for federal funding:

> to assist States to establish and operate a protection and advocacy

---

[1]The parties sometimes refer to the Act as PAIMI.  While 1988 amendments removed from the Act all use of the term "mentally ill individuals" and, instead, substituted "individuals with mental illness," the name of the Act itself was not changed.  See Requirements Applicable to Protection and Advocacy of Individuals with Mental Illness; Final Rule, 62 Fed. Reg. 53548-01 (Oct. 15, 1997).  Therefore, the Act will be referred to as "PAMII" in this Ruling.

system for individuals with mental illness which will (A) protect and advocate the rights of such individuals through activities to ensure enforcement of the Constitution and Federal and State statutes; and (B) investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred.

42 U.S.C. §10801(b)(2)(B).  In order to be eligible for such funding, states must establish systems to "(1) protect and advocate the rights of individuals with mental illness; and (2) investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred."  42 U.S.C. §10803(2).  Such systems are authorized to "investigate incidents of abuse and neglect of individuals with mental illness" and "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the state."  42 U.S.C. §10805(a)(1)(A)-(B).  They are entitled to access to records where certain criteria are met.  42 U.S.C. §10805(a)(4).  Such systems also must "have access to facilities in the State providing care or treatment."  42 U.S.C. §10805(a)(3).

### C.    The DD Act, PAMII Act, and PAIR Act Authorize OPA to Investigate Possible Abuse and Neglect at HTLA

Courts have found that protection and advocacy systems need not "make a threshold showing of mental illness" in order to exercise their authority under PAMII. Office of Protection and Advocacy for Persons with Disabilities v. Armstrong, 266 F.Supp.2d 303, 313 (D.Conn. 2003); Michigan Protection and Advocacy Service v. Miller, 849 F.Supp. 1202, 1207 (W.D.Mich. 1994).  A denial of access on the grounds that OPA has not made a conclusive showing that HTLA students are individuals with mental illness or developmentally disabled "prevents [OPA] from bringing in their own

7

mental health professionals to ascertain whether any [students] do in fact suffer from mental illness.  Such conduct . . . defeats the very purpose of PAMII and the DD Act to provide effective protection and advocacy services to mentally ill and developmentally disabled persons."  Michigan Protection and Advocacy Service, 849 F.Supp. at 1207.

Instead of requiring conclusive evidence that a particular person or persons qualifies as an individual with mental illness or developmentally disabled for the purposes of a protection and advocacy system's authorizing statutes, courts have held that a showing of "substantial evidence" must suffice in order for such systems to fulfill their statutory mandate.  See id. at 1207.  "'[E]vidence that a facility has previously housed individuals who are mentally ill, as well as evidence that some current residents may be mentally ill[,] is sufficient under PAMII to merit access by [protection and advocacy systems].'"  Office of Protection and Advocacy for Persons with Disabilities, 266 F.Supp.2d at 314 (quoting Kentucky Prot. & Advocacy Div. v. Hall, et al., No. 3:01cv-538-H, slip. op. (W.D.Ky. Sept. 24, 2001)) (emphasis added).

In order to be placed at HTLA, a child must first be designated "seriously emotionally disturbed."  Stipulations of Fact [Dkt. No. 13] at ¶ 7.  Defendants concede that "most HTLA students probably qualify as individuals with mental illness for PAMII's purposes."  Def.'s Objection to Mot. for Permanent Injunction [Dkt. No. 12] at n. 11.  Indeed, PAMII's definition of an "individual with mental illness" includes an "individual who has a significant . . . emotional impairment."  42 U.S.C. §10802(4)(A).  That definition appears to be inclusive of individuals who are "seriously emotionally disturbed."  Federal regulations define the term "serious emotional disturbance" to include the following:

> (1) A condition that has been confirmed by clinical evaluation and diagnosis and that, over a long period of time and to a marked degree, adversely affects educational performance and that exhibits one or more of the following characteristics: (i) An inability to learn that cannot be explained by intellectual, sensory, or health factors. (ii) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers. (iii) Inappropriate types of behavior under normal circumstances. (iv) A tendency to develop physical symptoms or fears associated with personal or school problems. (v) A general, pervasive mood of unhappiness or depression. (2) Schizophrenia, but does not include children who are socially maladjusted, unless it is determined that they are otherwise seriously emotionally disturbed.

Provision of Early Intervention Services to Eligible Infants and Toddlers with Disabilities and Their Families, and Special Education Children with Disabilities Within the Section 6 School Arrangements, 32 C.F.R. § 80.3 (2004).

The defendants dispute, however, that students at HTLA ought to be considered developmentally disabled for the purposes of the DD Act. The defendants provide the Affidavit of Jody S. Lefkowitz, Senior Director for Exceptional Children for Hartford Public Schools, which Affidavit claims that students with severe developmental disabilities are not placed at HTLA but are placed at other facilities in and outside of the Hartford Public School system. Affidavit of Jody S. Lefkowitz [Dkt. No. 12] at ¶¶ 8-10. In response, OPA provides an affidavit from its Assistant Program Director attesting that of OPA's former and current clients who are or have been students at HTLA, many have been developmentally disabled and that students who present symptoms of a developmental disability are sometimes labeled "seriously emotionally disturbed."

PAIR expands on the rights and protections created by PAMII and the DD Act and includes individuals with disabilities who do not qualify for services under either of the other statutes. 29 U.S.C. §794e. If a child diagnosed as "seriously emotionally

9

disturbed" is disabled for the purposes of section 794e but is not considered developmentally disabled for the purposes of the DD Act or to have a mental illness for the purposes of PAMII, that student may be subject to the protections of PAIR.  The fact that all HTLA students are diagnosed as "substantially emotionally impaired" allows an inference that students fall under the protection of either the DD Act or PAIR, both of which provide OPA with identical investigative powers.  These facts, considered alongside HTLA's concession that its students are "individuals with mental illness" for the purposes of PAMII[2], establish that OPA has met the standard set forth in <u>Armstrong</u> and is authorized by PAIR and PAMII to investigate incidents of abuse or neglect at HTLA.  The court need not resolve the parties' dispute regarding the applicability of the DD Act as PAIR provides OPA with the same authorities as does the DD Act.  42 U.S.C. §794e(f)(1)-(2).

**D.    OPA is Entitled to Access to HTLA**

 PAIR requires that protection and advocacy systems "have access at reasonable times to any individual with a developmental disability in a location in which services, supports, and other assistance are provided to such an individual."  42 U.S.C. §15043(a)(2)(H); <u>see</u> 28 U.S.C. §794e(f)(1)-(2) (providing that systems created pursuant to PAIR "have the same general authorities, including access to records and program income, as are set forth" in the DD Act).  Access under this provision is not limited to access to residential locations.  To the extent that HTLA serves students covered under the DD Act and PAIR, it must provide reasonable access to such

---

[2]Without this concession, the court would have reached the same conclusion based on the record before it.

students to OPA.  Because OPA has made a sufficient showing that students at HTLA are entitled to its services under PAIR, OPA is authorized to access "any individual . . . in a location" as is reasonable under the statute. Id.

Rather than provide access to individuals as the DD Act and PAIR do, PAMII requires that protection and advocacy systems "have access to facilities in the State providing care or treatment."  42 U.S.C. §10805(a)(3).  The defendants argue that they are not required to provide access to HTLA under PAMII because HTLA is not a "facility" for the purposes of the Act.  The Act provides that "[t]he term 'facilities' may include, but need not be limited to, hospitals, nursing homes, community facilities for individuals with mental illness, board and care homes, homeless shelters, and jails and prisons."  42 U.S.C. §10802(4).  Notably, while the statute does not limit use of the term "facilities" as such, all of the examples listed are residential institutions.  Implementing regulations have defined the term "facilities" to include "any public or private residential setting that provides overnight care accompanied by treatment services." Requirements Applicable to the Protection and Advocacy for Individuals with Mental Illness Program, Definitions, 42 C.F.R. §51.2 (2004) (emphasis added). The plaintiffs argue that PAMII was recently amended to expand its purview to nonresidential facilities and, the regulations have not yet been updated accordingly.  Pl.'s Reply Memo. to Def.'s Objection to Pl.'s Mot. for a Permanent Injunction [Dkt. NO. 14] at 8.

The court notes that PAMII was amended in 2000.  Public Law 106-310 expanded the definition of the term "individual with mental illness."  Prior to the 2000 amendment, the term applied only to individuals with "a significant mental illness or emotional impairment" who were inpatients or residents of facilities providing mental

11

health services, in the process of being admitted to such facilities, or confined in a detention facility.  An individual was not entitled to services under the act unless confined in a residential facility.

PAMII's legislative history supported such an interpretation of the original act. The Labor and Human Resources Committee prepared the 1985 Senate Report which laid out the bases for its recommendation that Public Law 99-319 be passed.  S. REP. NO. 99-109 (1985), reprinted in 1986 U.S.C.C.A.N. 1361.  The legislation was drafted in response to concerns regarding "the care and treatment of institutionalized persons who are developmentally disabled, mentally retarded, or mentally ill."  Id. at 1361.  The report described the results of "a 9-month staff investigation of conditions in state-operated facilities for the developmentally disabled, mentally retarded and/or mentally ill."  Id.  According to the report, the bill "defines 'mentally ill person' to mean an individual for whom a primary diagnosis of mental illness has been made and who resides for 24 hours each day in a residential facility."  Id.

In 2000, Public Law 106-310 amended PAMII's definition of a mentally ill individual to include persons who live "in a community setting, including their own home."  Children's Health Act of 2000, Pub. L. No. 106-310, codified at 42 U.S.C. §10802(4).  The 2000 amendment expanded the definition of a mentally ill individual for the purposes of PAMII.  The Act currently includes in its definition of an individual with mental illness a person "who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State . . . and lives in a community setting, including their own home."  42 U.S.C. 10802(4).  Thus, a protection and advocacy system must serve the needs of both

12

mentally ill individuals who are institutionalized or otherwise treated in residential facilities and individuals who are mentally ill and live in their own home.  Previously, an individual was considered "mentally ill" under the statute only if he suffered such an illness and resided in a facility providing treatment.  In effect, the 2000 amendment rewrites PAMII's definition of a mentally ill individual to include anyone with "a significant mental illness or emotional impairment, as determined by a mental health professional" without regard to where that person resides.  Such person may reside in a facility providing treatment or "in a community setting, including their own home."

When applying a statute, this court is "required to 'disfavor interpretations of statutes that render language superfluous.'"  Connecticut ex rel. Blumenthal v. U.S. Dept. of the Interior, 228 F.3d 82, 88 (2d Cir. 2000) (quoting Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992)).  Arguably, the interpretation suggested by OPA -- that it is authorized under PAMII "to investigate incidents of abuse and neglect of individuals with mental illness" pursuant to section 10805(a)(1)(A) regardless of where those individuals reside -- renders part B of section 10802(4) superfluous.  The definition of an "individual with mental illness" might as well be limited to part A of that section, without the conjunction "and" used to make additional requirements regarding an individual's residence.

Nevertheless, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  Connecticut Nat'l Bank, 503 U.S. at 253-54.  When Congress chose to revise the definition of "individual with mental illness," there was more than one way in which to do so.  For example, it could have removed section 10802(4)(B) in its entirety.  Instead, Congress chose to expand the

13

definition by adding a subsection that explicitly adds an additional category of individuals subject to the rights and protections created by the statute.  In the instant context, it would be clearly contrary to Congressional intent to excise that portion of statute in the interest of avoiding a reading that renders a section superfluous.  It is "far more likely that Congress inadvertently created a redundancy," Connecticut Nat'l Bank, 503 U.S. at 256 (O'Connor, concurring), or added the subsection to expressly extend coverage, than that it intended to limit its definition of mentally ill individuals to those residing in facilities where the statutory language expressly provides that the definition ought to include individuals residing in their own homes.  Therefore, PAMII authorizes protection and advocacy systems to investigate incidents of abuse and neglect and access an individual's mental health records without regard to an individual's residence. See 42 U.S.C. §10805(a)(1),(4).

        The more difficult question that remains is whether PAMII authorizes a protection and advocacy system to have physical access to a non-residential program providing treatment to mentally ill persons.  The statute requires that protection and advocacy systems, like OPA, must "have access to facilities in the State providing care or treatment."  42 U.S.C. §10805(a)(3).  Current regulations limit the definition of "facilities" to residential institutions.  42 C.F.R. §51.2 (2004) ("Facility includes any public or private residential setting that provides overnight care accompanied by treatment services.")  Those regulations, however, predate the 2000 amendments to PAMII.  They were released in their final form on October 15, 1997, three years before Congress amended its definition of individuals with mental illness under PAMII.  See 62 Fed. Reg. 53548.  They do not, for example, take into account the explicit revision of the definition

14

of an individual with mental illness and, instead, maintain the pre-2000 definition.  That the regulations have not been revised to address a statutory revision is not unusual. Between the statute's passage in 1986 and the 1991 amendments, no rules were promulgated pursuant to PAMII.  H.R. REP. NO. 102-319 (1991), reprinted in 1991 U.S.C.C.A.N. 777, 785.  Following 1991 amendments to PAMII that explicitly authorized rulemaking by the Department of Health and Human Services, final rules were not promulgated until October 1997, six years after those amendments were passed.  See Requirements Applicable to Protection and Advocacy of Individuals with Mental Illness; Notice of Proposed Rulemaking, 59 Fed. Reg. 64367-01 (December 14, 1994); Requirements Applicable to Protection and Advocacy of Individuals with Mental Illness; Final Rule, 62 Fed. Reg. 53548 (October 15, 1997).

No regulations interpret PAMII in its current and applicable form.  The court cannot defer to an agency interpretation that predates relevant amendments to the statute.  Compare Helvering v. Winmil, 305 U.S. 79, 83 ("Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law.").  Therefore, the court must consider the plain language as well as the legislative intent underlying the relevant section, which requires protection and advocacy systems to "have access to facilities in the State providing care or treatment." 42 U.S.C. §10805(a)(3).  The statute itself does not limit the term "facilities" to residential institutions.  Generally, the provisions of section 10805(a) provide protection and advocacy systems with the particular tools necessary to "protect and advocate the rights of individuals with mental illness." 42 U.S.C. §10805(a).  Fulfilling

15

the responsibility to "investigate incidents of abuse and neglect" and "pursue administrative, legal, and other appropriate remedies" requires certain investigative powers.  Id.  These powers include access to records, 42 U.S.C. §10805(a)(4), independence from other state agencies, 42 U.S.C. §10805(a)(2), and the ability to access those institutions where individuals with mental illness are treated, 42 U.S.C. §10805(a)(3).  If OPA's mandate is to protect and advocate the rights of all individuals with mental illness, regardless of whether they are treated as inpatients or outpatients, its access cannot be limited to residential facilities but must extend to all facilities treating individuals with mental illness.  To exclude facilities treating individuals who live in a community setting, including their own home, would be counter to the clear language of the statute, as well as its intent.  Thus, HTLA, as a facility providing care or treatment, is subject to access by OPA, pursuant to PAMII's grant of authority to that agency.  42 U.S.C. §10805(a)(4).  Therefore, both PAIR and PAMII entitle OPA to physical access to HTLA.

E.    **OPA is Entitled to the Names and Contact Information Sought**

While OPA's access to students' records is not limited by the fact that HTLA is not a residential institution, that access is limited by statutory provisions that address authorization by an individual with mental illness or a developmental disability or that person's legal representative.  See 42 U.S.C. §10805(a)(4); 42 U.S.C. §15043(a)(2)(I). Defendants argue that OPA cannot, pursuant to its authorizing statutes, access the records sought from HTLA.  Further, the defendants argue that if the statutes do authorize such access, OPA's request must nonetheless fail because HTLA and the Hartford Board of Education are bound by confidentiality provisions in the Federal

16

Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. §1232g, and the Individuals

with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400, et seq.  FERPA limits federal

educational funding to educational agencies and institutions that follow certain statutory

mandates with respect to release of information and educational records.  20 U.S.C.

§1232g.  IDEA requires educational institutions and agencies receiving federal funds

pursuant to that statute to abide by FERPA's mandates.  20 U.S.C. §1417(c).

      Section 10805, which authorizes OPA to access a person's records under

particular circumstances, does not define the term "records."  It is sensible under these

circumstances to incorporate the definition provided in section 10806, which references

section 10805(a)(4) and provides standards regarding confidentiality and disclosure of

records accessed by a protection and advocacy system pursuant to section

10805(a)(4).  See Pennsylvania Protection & Advocacy, Inc. v. Houstoun, 228 F.3d

423, 426 n. 1 (3d Cir. 2000).  Section 10806 provides that

> "records" includes reports prepared by any staff of a facility rendering care
> and treatment or reports prepared by an agency charged with
> investigating reports of incidents of abuse, neglect, and injury occurring at
> such facility that describe incidents of abuse, neglect, and injury occurring
> at such facility and the steps taken to investigate such incidents, and
> discharge planning records.

42 U.S.C. §10806(b)(3)(A).

      OPA concedes that it cannot access staff reports and similar records under the

requirements described in section 10805(a)(4).  Instead, it seeks "directory information"

so that it can contact the students' legal representatives for the purposes of securing

consent to review other records.  PAMII allows access to records where OPA receives a

complaint or has probable cause to believe that an individual's health or safety is in

17

serious and immediate jeopardy and OPA contacts the student's representative "upon receipt of the name and address of such representative." 42 U.S.C. §10805(a)(4)(c). Similarly, the DD Act provides for access to records where a developmentally disabled individual has a legal representative; OPA has received a complaint or has probable cause to believe that such individual has been subject to abuse or neglect; and OPA contacts the individual's legal representative, "upon receive of the name and address of such representative." 42 U.S.C. §15043(a)(2)(I)(iii). The circumstances under which OPA can obtain records are broader under the DD Act and PAIR. OPA need only have probable cause to believe that abuse or neglect has occurred or is occurring. Under PAMII, OPA must meet a higher burden, requiring it to have probable cause to believe that "the health or safety of the individual is in serious and immediate jeopardy." 42 U.S.C. §10805(a)(4)(c). The standard for finding that probable cause exists is lower for these purposes than it would be in the context of a criminal investigation. <u>Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Center</u>, 97 F.3d 492, 498-99 (11th Cir. 1996). Furthermore, courts have found that the protection and advocacy system, in this case OPA, is the final arbiter of probable cause for these purposes. <u>Office of Protection and Advocacy for Persons with Disabilities v. Armstrong</u>, 266 F.Supp.2d 303, 321 (D.Conn. 2003); <u>Center for Legal Advocacy v. Earnest</u>, 188 F.Supp.2d 1251, 1257 (D.Colo. 2002), <u>rev'd on other grounds</u>, 320 F.3d 1107 (10th Cir. 2003); <u>Arizona Center for Disability Law v. Allen</u>, 197 F.R.D. 689 (D.Ariz. 2000). The court need not determine for these purposes whether OPA is in fact the final arbiter of probable cause because the court's view is that probable cause exists in the instant circumstance.

The language of the provisions authorizing access to records is far from clear. Were the phrase "upon receipt of the name and address of such representative", as used in both the DD Act and PAMII, to be construed to mean that a protection and advocacy system be required to contact that representative without HTLA providing the name and address, the phrase would be meaningless.  Instead, the court reads the phrase to authorize a request by OPA for the names and addresses of students for whom there is the requisite degree of probable cause to demand records under PAMII and the DD Act.  Upon receipt of such information, OPA can attempt to contact legal representatives of such individuals in order to obtain express permission to act on their behalf.  Regulations promulgated pursuant to both the DD Act and PAMII support this interpretation of the statute.  They use identical language to provide that a protection and advocacy system "shall be provided promptly . . . the name, address and telephone number of the legal guardian, conservator, or other legal representative of an individual" with developmental disabilities or mental illness where the system is denied access to facilities or records "for alleged lack of authorization."  State System for Protection and Advocacy of the Rights of Individuals with Disabilities, 45 C.F.R. §1386.22 (2004) (DD Act); 42 C.F.R. §51.43 (2003) (PAMII).

While defendants contest the applicability of either PAMII or the DD Act to HTLA, they concede that the statutes and regulations create a responsibility on the part of an institution to provide contact information for an individual's "legal guardian, conservator, or other legal representative", where an institution refuses to release that individual's records on the grounds that an individual or his legal representative has not authorized such release.  Id.  The defendants argue, however, that students at HTLA who are not in

19

state custody do not have such a legal representative for the purposes of these
statutes.  They cite regulations pursuant to both PAMII and the DD Act that provide a
limited definition of the terms "legal guardian, conservator, and legal representative."

> Legal Guardian, Conservator, and Legal Representative all mean an
> individual whose appointment is made and regularly reviewed by a State
> court or agency empowered under State law to appoint and review such
> officers, and having authority to consent to health/mental health care or
> treatment of an individual with mental illness.  It does not include persons
> acting only as representative payee, persons acting only to handle
> financial payments, attorneys or persons acting on behalf of an individual
> with mental illness only in individual legal matters, or officials responsible
> for the provision of health or mental health services to an individual with
> mental illness, or their designees.

42 C.F.R. §51.2 (2004) (PAMII).  The regulations pursuant to the DD Act are
substantially similar.  45 C.F.R. §1386.19 (2004).

The defendants argue that by the plain terms of the regulation, parents of a
minor do not qualify as a "Legal Guardian, Conservator, [or] Legal Representative."
Therefore, HTLA is not required to turn over names and contact information for
students' parents pursuant to the DD Act, PAMII, PAIR, or any of the regulations
pursuant to such statutes.

The defendants' interpretation of the regulations is counter to that of the
promulgating agency, the U.S. Department of Health and Human Services.  The final
rule appeared in the Federal Register on October 15, 1997.  The accompanying
commentary included clarification of the definition of a "Legal Guardian, Conservator,
and Legal Representative."  While the Department confirmed that certain persons
responsible for mentally ill persons were excluded from the definition, "natural or
adoptive parents [of minor children] are legal guardians unless the State has appointed

20

another legal guardian under applicable State law."  Substance Abuse and Mental
Health Services Administration; Requirements Applicable to Protection and Advocacy of
Individuals with Mental Illness; Final Rule, 62 Fed. Reg. 53548-01, 53552.  Indeed, a
1991 amendment to PAMII emphasized the role of family members in the protection of
and advocacy for mentally ill persons.  See 42 U.S.C. §10801(a)(2).  The Committee on
Energy Commerce concluded that "the involvement of family members is crucial to the
successful implementation of the PAMII Act and therefore family involvement should be
welcomed and encouraged."  H.R. REP. No. 102-319, reprinted in 1991 U.S.C.C.A.N.
777, 781.

        The defendants argue that their interpretation of the regulations supports their
contention that PAMII does provide for services, protection, or advocacy for minors with
parents who maintain custody and guardianship, but the committee report is counter to
that argument.  That report provides that, "P&A staff should involve family members
where the family member with a mental illness is a minor . . . ."  Id.  For the statute and
its regulations to ignore parents' roles as legal guardians of their children would run
counter to statutory objectives.  On this basis and crediting the agency's interpretation
of its own regulation, the court cannot conclude that parents are excluded from the
definition of a "Legal Guardian, Conservator, and Legal Representative."  PAMII grants
expansive powers to protection and advocacy systems to investigate incidents of
neglect of abuse of individuals with mental illness.  "In this regard, it is no less critical to
access the records of those with natural parents as those with legal guardians.  Without
the disclosure by the facility of the parents' names and addresses, it may be impossible
for the P&A to contact those parents; at the very least, it might significantly delay the

21

process." <u>Advocacy, Incorporated v. The Brown Schools, Inc.</u>, 2001 WL 1910563 at *4 (W.D.Tex. October 1, 2001).

     The defendants argue that, even if OPA has the right to obtain the information it seeks, other statutes prohibit such release of HTLA records.  FERPA provides that "[n]o funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein other than directory information . . .) of students without the written consent of their parents to any individual, agency, or organization . . . ."  20 U.S.C. §1232g(b)(1).  FERPA's restrictions on access to educational records appear to conflict with the DD Act and PAMII's grant of authority to protection and advocacy systems to access such information.  Where the court "find[s] no 'clear and manifest' indication that Congress intended [one section] to repeal [another], it is our duty to harmonize the provisions, if possible." <u>Auburn Housing Authority v. Martinez</u>, 277 F.3d 138, 150 (2d Cir. 2002).

     The defendants cite to <u>Washington Protection and Advocacy System, Inc. v. Evergreen School District</u>, C03-5062(FDB), to support their contention that, in light of FERPA, public schools cannot provide records requested by protection and advocacy systems organized pursuant to the DD Act, PAMII, and PAIR.  In a ruling on a motion for a preliminary injunction, the <u>Washington Protection and Advocacy System</u> court determined that it was "not sufficiently satisfied that the P&A Acts override the FERPA and IDEA." <u>Id.</u> at 3.  No rationale was provided for this conclusion.  Furthermore, that court considered only the plaintiff's likelihood of success on the merits, not actual success on the merits.  In addition, the conclusion that the Washington Protection and

22

Advocacy System had not established a likelihood of success was based not only on

FERPA and IDEA, but also on that court's finding that the plaintiff did not have probable

cause to believe that the child in question had suffered abuse and neglect.  Id. at 5.

The Western District of Michigan, in Michigan Protection & Advocacy Service,

849 F.Supp. at 1208, supra, section II.C, appears to be the only other court to have

considered the potential conflict between FERPA and IDEA, on one hand, and the DD

Act and PAMII, on the other.  That court concluded that, given the unequivocal statutory

mandate afforded to protection and advocacy systems to access records in specific

situations and the statutory responsibility of such organizations to keep such records

confidential, FERPA and IDEA did not prevent educational institutions and agencies

from providing such systems with records.  Id.  While the defendant urges the court not

to consider the Michigan ruling persuasive because it addressed only physical access

to an institution, the court notes that the ruling explicitly addressed documentary

records as well.  Id.

In reconciling the two statutes, it is important to note that the OPA is bound by

state and federal law regarding confidentiality.  Conn. Gen. Stat. §46a-11h; 42 U.S.C.

§10806.  State law provides that "all confidential records obtained by the office in the

course of any such investigation shall be confidential and shall not be subject to

disclosure under the Freedom of Information Act."  Conn. Gen. Stat. §46a-11h.  Federal

law requires OPA to maintain the same standards with respect to confidentiality as does

the institution from which it receives records.

> An eligible system which, pursuant to section 10805(a)(4) of this title, has
> access to records which, under Federal or State law, are required to be
> maintained in a confidential manner by a provider of mental health

services, shall . . . maintain the confidentiality of such records to the same extent as is required of the provider of such services.

42 U.S.C. §10806(a).   Thus, PAMII explicitly contemplates those instances in which a protection and advocacy system may request records that are confidential under federal law, in this case FERPA and IDEA.  In such situations, PAMII requires that a protection and advocacy system "maintain the confidentiality of such records to the same extent as is required of the provider" by the applicable law.  Id.  OPA, therefore, is bound by the confidentiality provisions of FERPA and IDEA upon receipt of any educational records from the defendants.  To allow protection and advocacy systems access to records in the limited circumstances provided for in the DD Act, PAMII, and PAIR does not contravene Congress' intent to maintain parents' and students' confidentiality.  In this case, allowing OPA to access parents' names and contact information serves the purposes of all of the above statutes by allowing OPA to pursue its investigation as required by PAMII and PAIR while limiting its access to records until it receives authorization from students and parents, as is required by FERPA and IDEA.  Thus, the court is able to harmonize the various statutes.  This reading is preferable to a finding that one or more of the statutes repeals by implication one or more of the others where there is no indication that Congress intended such result.  Thus, pursuant to PAMII and PAIR, OPA is entitled to names and contact information for parents and legal guardians of students at HTLA.

**III.    CONCLUSION**

For the reasons discussed above, the court declares that the defendants' refusal to provide the plaintiffs with physical access to HTLA when students are present and

with name and contact information for parents and legal guardians of HTLA's students

violates PAMII and PAIR.  The defendants are hereby ordered to grant both physical

access and names and contact information such that OPA can perform its statutory

duty to investigate suspected abuse and neglect.  The case is closed.  The court retains

jurisdiction to ensure compliance.

**SO ORDERED**

      Dated at Bridgeport, Connecticut this 7th day of February, 2005.


          /s/ Janet C. Hall_____
          Janet C. Hall
          United States District Judge